695 A.2d 143

**STATE of Maryland**

v.

**Hossein GHAJARI.**

**No. 46, Sept. Term, 1996.**

Court of Appeals of Maryland.

June 17, 1997.

Gary E. Blair, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for Petitioner.

George E. Burns, Jr., Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER JJ.

CHASANOW, Judge.

Hossein Ghajari, Respondent in this action, was charged with two counts of child abduction pursuant to Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 2[1] (hereinafter § 2) and two counts of child abduction by a relative pursuant to Md. Code (1984, 1991 Repl.Vol., 1996 Supp.), Family Law Art., § 9–305 (hereinafter § 9–305). Section 2 states, in pertinent part:

"Any person who shall without the color of right forcibly abduct, take or carry away any child under the age of twelve years from the home or usual place of abode of such child, or from the custody and control of the parent or

---

1. At the time of Respondent's arrest, the statute was codified at Maryland Code (1957, 1992 Repl.Vol.), Article 27, § 2. There has been no substantive change in the statute since Respondent's arrest.

parents, or lawful guardian or guardians of such child, or be accessory thereto, or who shall without such color of right and against the consent of the parent or parents or lawful guardian or guardians of such child, persuade or entice from the usual place of abode or house of such child, or from the custody and control of the parent or parents, or guardian or guardians of such child, or be accessory thereto, or shall knowingly secrete or harbor such child, or be accessory thereto, with the intent to deprive such parent or parents, guardian or guardians, or any person who may be in lawful possession of such child, of the custody, care and control of such child, shall be guilty of a felony, and upon conviction shall suffer imprisonment in the penitentiary for a term not exceeding twenty years, in the discretion of the court."

Section 9–305 pertains specifically to child abduction by a relative, and it states:

"If a child is under the age of 16 years, a relative who knows that another person is the lawful custodian of the child may not:

(1) abduct, take, or carry away the child from the lawful custodian to a place outside of this State;

(2) having acquired lawful possession of the child, detain the child outside of this State for more than 48 hours after the lawful custodian demands that the child be returned;

(3) harbor or hide the child outside of this State knowing that possession of the child was obtained by another relative in violation of this section; or

(4) act as an accessory to an act prohibited by this section."

In the Circuit Court for Carroll County, Respondent entered a plea of not guilty on all counts, and both parties agreed to proceed on the following statement of facts:

"On or about March 16th, 1990, at 349 Bishop Street, Apartment V, Westminster, Carroll County, Maryland, the [Respondent], Hossein Nasri Ghajari, did, without the color of right and against the consent of the parent, lawful custodian and natural mother, Homayoun [Tajali Bakhsh],

did persuade and entice Simin Ghajari, the daughter, date of birth July 13, 1982, and Siavash Ghajari, the son, date of birth April 23rd, 1984, from the home of Simin and Siavash Ghajari, that was located at 349 Bishop Street, Westminster, Carroll County, Maryland, and he did transport the children to the State of New York, in the United States, and from there to the country of Iran, and did keep, secrete, and harbor the children there with the intent to deprive their mother of the custody, care and control of the children, until such time [as] the children were … recovered by their mother on June 27th, 1993, in Iran.

[A]ll of this was being done contrary to the mother's custodial right in the children, which prohibited the removal of the children from the State of Maryland in violation of Article 27, Section 2, as well as the Family Law Article he's charged with. The [Respondent] also knew the mother was the lawful custodian of the children.

Specifically, the [Respondent] and Homayoun [Tajali Bakhsh] were married. They had two children, a daughter, Simin, born July 13th, 1982, and a son, Siavash, who was born on April 23rd of 1984. The [Respondent] and Homayoun separated in 1988. They entered into a Voluntary Separation and Property Agreement that was dated August 31st, 1988, wherein it was agreed that the wife, Homayoun, was to have custody of the two children, and that the [Respondent] was to have liberal visitation, but he was not to remove the children from the State without prior written consent from the wife. The [Respondent] signed this agreement.

On October 20th of 1988, a Consent Order was signed by [the Circuit Court for Carroll County] and the [Respondent] and Homayoun. In this Consent Order, the Court granted temporary care and custody of the children to the mother … and it further ordered that the [Respondent] was to have reasonable visitation with the children with the following caveat: That the [Respondent] was not to remove the children from the State of Maryland without the prior written consent of the mother.

The parties were divorced, absolutely, on April 20th, 1990, and Homayoun was granted custody, and the [Respondent] was granted reasonable visitation.

On or about March 16th of 1990, the [Respondent] picked up his children, Simin, who was seven years old at the time, and Siavash, who was five at the time. He picked them up from their home, located at 349 Bishop Street, Carroll County, Maryland. The [Respondent] was to have the two children for a weekend visitation and was to return them by 7 a.m. the morning of March 19th of 1990. The [Respondent] did not have written or oral permission from the natural mother ... to take the children out of the state. Plans to take the children out of the state or country were never discussed with the mother.

On March 19th, 1990, when the children were not returned to their home, Homayoun called their school and found that neither child was in school. The only person Homayoun knew to contact was a relative of the [Respondent], who she knew as Ali. This was ... who the [Respondent] was living with in New York at the time. When she contacted Ali, he provided the following information to her: That the [Respondent] borrowed his car to drive to Maryland to see his children. On March 17th, 1990, Ali received a call from the [Respondent] stating that the car could be picked up at Kennedy Airport; that the [Respondent] had removed all his personal belongings from the residence in New York, and when the police contacted Ali later on, he told them that he went to Kennedy Airport to get his car, he saw the [Respondent] and the two children in a Delta Airline terminal but did not know where they were going.

[At] 5:30 p.m. on March 19th, 1990, Homayoun called the [Respondent]'s mother, who was living in Iran. She had a feeling that that's where he would go. She talked to the [Respondent]. She could hear her children in the background, but the [Respondent] would not let her talk to them at that time. The [Respondent] had to obtain passports for the children in order to travel to Iran, because Homayoun had the children's passports at the time. At the time, the

[Respondent] was an Iranian citizen and was in this country on a green card. During this phone call, she demanded the return of the children. She also demanded the return of the children when she talked with the [Respondent] when she would call ... the children on a monthly basis. The [Respondent] refused and said it was her turn to be miserable.

Homayoun did not see her children again for three years and two months. When she went back to Iran and found her children, she gave them the choice to stay in Iran or go home to the United States. Both children chose to return with their mother to the United States and did so on June 27th of 1993. The children were nine and eleven when they came back to the United States.

During their absence, Homayoun talked to the children once a month. She also talked with the [Respondent], who would continually try and persuade her to come back to Iran.

[T]he children would testify that they were not aware their father was not to take them out of the state in March of 1990. He told them he was taking them to New York to visit relatives, and when he took them to the airport, he told them that they were going back home.

The [Respondent] would be identified by Homayoun and his two children, Simin and Siavash, as the individual who's seated next to his attorney at [the] trial table.

\* \* \*

[A]t no time did the [Respondent] have permission to take the children out of the state and out of the country. All of these events did occur in Carroll County, the [Respondent] having been identified."

The judge found Respondent guilty on all counts. Respondent was sentenced to two ten-year terms of imprisonment on the § 2 charges and two one-year terms of imprisonment on the § 9–305 charges, all to be served concurrently. All sentences were suspended on the condition that Respondent complete a five-year term of probation.

Respondent appealed to the Court of Special Appeals. He argued that § 9–305, pertaining to child abduction by a relative, was a specific variation of § 2, a general child abduction statute, and that, therefore, the trial court was allowed to impose, at most, a term of incarceration of one year, the maximum term of incarceration allowed by the specific statute. *See Henry v. State*, 273 Md. 131, 133 n. 1, 328 A.2d 293, 295 n. 1 (1974). He also argued that the trial court erred in failing to merge the § 2 convictions into the § 9–305 convictions. *See Johnson v. State*, 283 Md. 196, 203–04, 388 A.2d 926, 930 (1978). The Court of Special Appeals held that a parent, even a non-custodial parent, whose parental rights have not been judicially terminated prior to the abduction of his or her child may not be prosecuted under § 2 for the abduction.[2] *Ghajari v. State*, 108 Md.App. 586, 592, 673 A.2d 709, 712 (1996). The court reversed Respondent's convictions under § 2 and affirmed his convictions under § 9–305. *Ghajari*, 108 Md.App. at 595, 673 A.2d at 713.

This Court granted the State's petition for a writ of certiorari to consider an issue of first impression in Maryland,[3] whether a non-custodial parent may be convicted of child abduction under both § 2 and § 9–305. We also granted Respondent's cross-petition for a writ of certiorari to consider whether, if a non-custodial parent can be convicted under both child abduction statutes, the penalty for such convictions is limited to the penalty prescribed by § 9–305 and whether a conviction under § 2 merges into a conviction under § 9–305. We agree that a non-custodial parent is exempt from prosecution under § 2. We shall, therefore, affirm the decision of the

---

2. The Court of Special Appeals stated in a footnote that it was persuaded that parents whose rights have been judicially terminated could be prosecuted under § 2. This issue has not been presented to this Court, however, and we do not reach it.

3. The issue of whether a non-custodial parent who abducts his children may be prosecuted under both § 2 and § 9–305 was before this Court in *Trindle v. State*, but the issue was rendered moot prior to the resolution of the appeal. 326 Md. 25, 30, 602 A.2d 1232, 1234 (1992).

Court of Special Appeals. In light of our holding, the issues raised by Respondent's cross-petition are moot.

## I.

 Before reaching the merits of the case, we must first consider a motion to dismiss that has been filed by Respondent. The mandate of the Court of Special Appeals that reversed Respondent's convictions under § 2 was issued on April 26, 1996. On May 3, 1996, a verdict of not guilty was entered on the docket as to each count of child abduction under § 2.

Respondent argues that, under the doctrine of *autrefois acquit*, or former acquittal, this case must be dismissed because the State is prohibited from appealing from a judgment of acquittal and because a not guilty verdict may not be disturbed or revised by any Maryland court. This is a correct statement of the law, however, only if a verdict of not guilty has been intentionally rendered by a court. In *Daff v. State*, we stated:

> "The principle embodied in the plea of *autrefois acquit* has been broadly interpreted. * * * Once a trial judge has *intentionally rendered a verdict of not guilty*, a subsequent change of mind is prohibited even though the judge may be convinced, even moments later, that the verdict was erroneous." (Emphasis added). ( Citations omitted).

317 Md. 678, 684–85, 566 A.2d 120, 123 (1989).

After some investigation, counsel here informed this Court that Judge Burns did not enter or intend to enter any verdict with regard to the § 2 convictions and that the entry of the not guilty verdicts was not made by him or at his direction. The verdicts of not guilty were mistakenly entered on the docket by a courthouse clerk. Because a judge did not render any verdict as to the § 2 charges of child abduction and the clerk was not authorized to enter the verdicts of not guilty, this Court is not prohibited from reviewing this case. Respondent's motion to dismiss is denied.

## II.

The Maryland General Assembly passed a child stealing act in 1876. Chapter 324 of the Acts of 1876. In 1888, the Act was recodified, in substantially the same form as it exists today, at § 2 of Art. 27. By its terms, § 2 applies to "[a]ny person" who, among other things, abducts a child under the age of twelve "without the color of right."

The intermediate appellate court, in an opinion written by now Chief Judge Joseph Murphy, reached its holding in this case primarily by explicating the phrase "without color of right" as it is used in § 2. The court stated that "[c]olor has been defined as 'an appearance, semblance or *simulacrum*, as distinguished from that which is real.' " *Ghajari*, 108 Md.App. at 593, 673 A.2d at 712 (quoting *Black's Law Dictionary* 265 (6th ed.1990)). The court then compared the term "color of right" to the term "color of state law," which has been defined as: " 'Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law....' " *Id.* (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368, 1383 (1941)). Relying on these two definitions, the court held that § 2 could not apply to Respondent. *Ghajari*, 108 Md. App. at 594, 673 A.2d at 712. Section 2 applies only to persons who act "without color of right," but, the court concluded that Respondent was "clothed with the 'color of right' to the custody of his children" by virtue of a Consent Order that granted him the right to visitation of his children. *Ghajari*, 108 Md.App. at 593–94, 673 A.2d at 712.

The court also discussed the intent of the General Assembly in enacting § 9–305. *Ghajari*, 108 Md.App. at 594, 673 A.2d at 712–13. The court's review of the bill file for § 9–305 led the court to conclude: "The legislature enacted [§ 9–305] under the correct impression that Maryland law lacked criminal sanctions against non-custodial parents who snatch their children from the children's custodial parents." *Id.* One note in the bill file, written on the bill's request form, states: "Maryland has no criminal penalties for 'child-snatching' by [a]

parent or agent of [a] parent . . . ." and explains that Senator Miller, the primary sponsor of the bill, was interested in covering such a situation. There is also a memorandum written at the request of and addressed to Senator Curran, another of the bill's sponsors. It stated that perhaps the child stealing provisions need not be made broadly applicable to "relatives," instead of merely to parents, because "the taking of a child by anyone *other than a parent* would be covered by federal kidnapping statutes." (Emphasis in original).

These notations do suggest that the legislature may have been under the impression that there were no criminal sanctions available to punish child abduction by the child's non-custodial parent. As the intermediate appellate court noted, § 2 was originally enacted in 1876, and its legislative history is unavailable. *See Ghajari*, 108 Md.App. at 594 n. 6, 673 A.2d at 713 n. 6. It is arguable, however, that § 2 did apply to non-custodial parents based on the plain language of the statute itself, which, by its terms, applied to "any person . . . without color of right." It should be noted, however, that the legislature did not define "person" or "color of right."

In addition, the Maryland Commission on Criminal Law suggested that § 2 applied to non-custodial parents in its proposed revisions to the criminal code. MARYLAND COMM'N ON CRIMINAL LAW, REPORT AND PART I OF THE PROPOSED CRIMINAL CODE at 196 (1972). The introduction to Part 135, entitled, "Kidnapping, Coercion, and Related Offenses," explains that what is broadly considered to be kidnapping is actually four "old misdemeanors," abduction, child stealing, false imprisonment, and common law kidnapping. Concerning the offense of child stealing the Commission stated:

"Usually the gist of the offense is depriving a parent or guardian of custody, and often the offender is a parent or relative. *See Article 27, Section 2, of the Maryland Code, and note that the main kidnapping sections, Sections 337 and 338, except the case of taking by a parent of young children.*" (Emphasis added).

*Id.* This may suggest that, as of 1972, § 2 was Maryland's law on custodial interference via child stealing and that it applied to non-custodial parents and relatives.

One reason that the legislators who enacted § 9–305 may have believed that § 2 did not apply to non-custodial parents is that, in fact, non-custodial parents were rarely prosecuted under § 2. One student commentator has suggested that non-custodial parents were rarely prosecuted under § 2 because the prosecutors did not think it appropriate to subject a non-custodial parent to a lengthy period of incarceration:

> "One theory for the lack of prosecution is that the sanctions provided by child-stealing statutes have been generally too severe to warrant use against a parental offender. For instance, Maryland's 1876 Child Abduction Act carries a maximum sentence of twenty years imprisonment. Mitigating factors, such as the affection motivating the natural parent and the absence of any physical threat of harm to the child, probably have resulted in the bypass of this criminal sanction in parental child abduction cases." (Footnotes omitted).

*Child Abduction by a Relative: Maryland Enacts a Misdemeanor Offense to Deter Parental Child–Stealing,* 8 U. Balt. L.Rev. 609, 616 (1979). The Criminal Law Commission expressed a similar sentiment when it stated:

> "*Custodial and non-custodial kidnappings:* Some modern codes remove from the general crimes of kidnapping and unlawful detention the special case of custodial interference, that is, the case in which the defendant is trying to change the custody of the child or incompetent and restrains or abducts him for this reason. This is a different kind of crime; the defendant does not think of his act as harmful to the child, is usually a relative, and does not arouse the same kind of alarm in the other relatives as in other kinds of unlawful detention."

MARYLAND COMM'N ON CRIMINAL LAW, REPORT AND PART I OF THE PROPOSED CRIMINAL CODE, at 197. The Commission suggested that it would prefer to treat custodial interference as a sepa-

rate offense from all other child abductions and detentions. The first reason offered for this preference was that " '[t]he interest protected is not freedom from physical danger or terrorization by abduction, . . . but rather the maintenance of parental custody against all unlawful interruption. . . . ' " *Id.* (quoting MODEL PENAL CODE § 212.4 (Tentative Draft No. 11, 1960)). The second reason was that custodial interference could appropriately carry less severe sanctions than all other detentions. *Id.*

Regardless of whether § 2 ever applied to child abductions by parents, the General Assembly, in 1978, enacted a statute that was intended to be the exclusive provision under which a non-custodial parent would be prosecuted for the abduction of his or her child. Ch. 435 of the Acts of 1978 (codified at Md.Code (1957, 1976 Repl.Vol., 1981 Cum.Supp.), Art. 27, § 2A,[4] (hereinafter § 2A)). Section 2A made the abduction of

---

**4.** The statute read, in pertinent part:

"(a) *'Lawful custodian' defined.*—As used in this section, 'lawful custodian' means a person authorized, either alone or together with another person or persons, to have custody and exercise control over a child less than 12 years of age at the time and place of an act to which any provision of this section is, or may be alleged to be, applicable. The term shall include any person so authorized:

(1) By an order of a court of competent jurisdiction of this State.

(2) By an order of a court of competent jurisdiction of another state, territory, or the District of Columbia. However, when there has been a designation of a lawful custodian by an order of a court of this State and there appears to be a conflict between that order and a custody order issued by the court of another state or jurisdiction qualifying some other person as the custodian of the child, the 'lawful custodian' is the person appointed by order of a court of this State unless the order of the other state or jurisdiction:

(i) Is later in date than the order of a court of this State; and

(ii) Was issued in proceedings in which the person appointed by a custody order of a court of this State either consented to the custody order entered by the court of the other state or jurisdiction, or participated therein personally as a party.

(b) *Meaning of 'relative.'*—As used in this section, 'relative' means a parent, other ancestor, brother, sister, uncle, or aunt, or one who has at some prior time been a lawful custodian.

(c) *Prohibited acts.*—A relative, who is aware that another person is a lawful custodian of a child, may not:

(1) Abduct, take, or carry away a child under 12 years of age from the lawful custodian;

a child from its lawful custodian by a relative a misdemeanor punishable by up to 30 days imprisonment, a fine of up to $250, or both. § 2A(c),(d). "Lawful custodian" was defined as "a person authorized, either alone or together with another person or persons, to have custody and exercise control over a child less than 12 years of age at the time and place of an act to which any provision of this section is, or may be alleged to be, applicable." § 2A(a). "Relative" was defined as "a parent, other ancestor, brother, sister, uncle, or aunt, or one who has at some prior time been a lawful custodian." § 2A(b).

Even after § 2A was enacted, however, custodial parents whose children had been abducted by non-custodial parents experienced great difficulties prosecuting the abductors once the children had been removed from the state because extradition was generally not available for misdemeanor offenses. Thus, in 1982, § 2A was amended; an abduction to a location within the state remained a misdemeanor, but an abduction to a location outside of the state became a felony. Md.Code (1957, 1982 Repl.Vol., 1983 Cum.Supp.), Art. 27, § 2A(c)(2), (d)(2), (d)(3). The bill file for § 2A explains that the penalties for removing an abducted child from the state for more than 30 days were stiffened by the 1982 amendments in the hope that the penalty itself might serve as a deterrent.

Finally, in 1984, the General Assembly consolidated all statutes relating to the custody of children, including § 2A, in the new Family Law Article of the Maryland Code. Ch. 296 of the Acts of 1984. Section 2A(d), which covered the removal of

---

(2) Detain a child under 12 years of age away from the lawful custodian for more than 48 hours after return is demanded by the lawful custodian;

(3) Harbor or secrete a child under 12 years of age knowing that the physical custody of the child has been obtained or retained in violation of this section; or

(4) Act as an accessory to any of the actions forbidden in this section.

(d) *Penalty.*—A person convicted of violating any provision of this section is guilty of a misdemeanor and upon conviction shall be imprisoned for a period not exceeding 30 days, or fined a sum not exceeding $250, or both."

abducted children from the state, was repealed and recodified, without substantive change, at § 9–305.

The State argues that § 2, by its terms, still applies to "any person," including parents, and that if the General Assembly had intended parents to be covered only by § 9–305 and not by § 2, it would have provided an express parental exemption from § 2, as it did in Maryland's kidnapping statutes, Md. Code (1957, 1996 Repl.Vol.), Art. 27, §§ 337, 338. Respondent contends, however, that § 9–305 impliedly repealed § 2 with regard to child abduction by a relative because the General Assembly intended relatives to be prosecuted exclusively under § 9–305.

This Court has often stated that the cardinal rule of statutory construction is to effectuate the intent of the legislature. *E.g., Management Personnel Serv. v. Sandefur,* 300 Md. 332, 341, 478 A.2d 310, 314 (1984). We presume that the legislature intends its enactments "to operate together as a consistent and harmonious body of law." *State v. Harris,* 327 Md. 32, 39, 607 A.2d 552, 555 (1992); *Farmers & Merchants National Bank of Hagerstown v. Schlossberg,* 306 Md. 48, 61, 507 A.2d 172, 178 (1986). Thus, when two statutes appear to apply to the same situation, this Court will attempt to give effect to both statutes to the extent that they are reconcilable. *See Harris,* 327 Md. at 39, 607 A.2d at 555; *Management Personnel Serv.,* 300 Md. at 341, 478 A.2d at 314. Nevertheless, "if two statutes contain an irreconcilable conflict, the statute whose relevant substantive provisions were enacted most recently may impliedly repeal any conflicting provision of the earlier statute." *Harris,* 327 Md. at 39, 607 A.2d at 555 (holding there had been no repeal by implication)(citing *Farmers & Merchants Bank,* 306 Md. at 61, 507 A.2d at 178–79); *Criminal Injuries Comp. Bd. v. Gould,* 273 Md. 486, 494–95, 331 A.2d 55, 61 (1975). We have stated, however, that "[r]epeal by implication is not favored, and is carried no farther than is required to gratify the legislative intent manifested in the later act." *Thomas v. State,* 173 Md. 676, 683, 197 A. 296,

299 (1938) (citations omitted)(earlier enacted, specific, local statute repealed by later enacted, general, state statute).

■ We have also stated: "It is well settled that when two statutes, one general and one specific, are found to conflict, the specific statute will be regarded as an exception to the general statute." *Farmers & Merchants Bank*, 306 Md. at 63, 507 A.2d at 180 (holding general enactment impliedly repealed by specific enactment). In such a situation, the specific statute is controlling and the general statute is repealed to the extent of the inconsistency. *See Gould*, 273 Md. at 495, 331 A.2d at 61. Thus, when reconciling a specific and a general statute, a court should give effect to the specific statute in its entirety and should retain as much of the general statute as is reasonably possible. *See* 1A NORMAN J. SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION §§ 23.06, 23.09, 23.16 (5th ed. 1993).

For example, in *Maguire v. State*, 192 Md. 615, 65 A.2d 299 (1949), we considered whether a plumber licensed under Md. Code (1939), Art. 56, § 290 was also required to be licensed under Md.Code (1939, 1947 Supp.), Art. 56, § 291. Section 290 required that plumbers and gas fitters be licensed to perform such work. *Maguire*, 192 Md. at 619, 65 A.2d at 300. Section 291 required any person or entity engaging in the business of "construction" to be licensed to perform such work. *Id.* "Construction" was defined as "accepting orders or contracts for doing any work on or in any building or structure, requiring the use of . . . galvanized iron or piping . . . or any other building material." *Id.* When the State Comptroller demanded that Maguire pay the license fees required under § 291 for the years 1944 through 1947, in addition to the fees he had already paid to obtain a license under § 290, Maguire refused and filed suit in the Superior Court of Baltimore City. *Maguire*, 192 Md. at 621, 65 A.2d at 301.

The Superior Court found that both statutes, by their plain language, applied to plumbers and that if the legislature had intended the two sections to be mutually exclusive, it would have said so. The lower court thus held that Maguire was

required to obtain the § 291 license that he lacked. *See Maguire,* 192 Md. at 618, 65 A.2d at 300.

■ Maguire appealed to this Court, where we stated that although the lower court correctly stated the rules of statutory construction, it misapplied those rules when construing the two statutes at issue. *Maguire,* 192 Md. at 622, 65 A.2d at 302. We stated that in construing a statute according to its plain meaning we would not consider the language of a statute apart from its context. *Maguire,* 192 Md. at 623, 65 A.2d at 302 ("Adherence to the meaning of words does not require or permit isolation of words from their context."). Indeed, we explained that " 'the meaning of the plainest words in a statute may be controlled by the context.' " *Id.* (quoting *Pittman v. Housing Authority,* 180 Md. 457, 463–64, 25 A.2d 466, 469 (1942)); *see also Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 514–16, 525 A.2d 628, 632 (1987). Courts also have a duty " 'to restrict the meaning of general words, whenever it is found necessary to do so, in order to carry out the legislative intention.' " *Maguire,* 192 Md. at 623, 65 A.2d at 302 (quoting *Reiche v. Smythe,* 13 Wall. 162, 164, 20˙ L.Ed. 566, 566–67 (1872)). Finally, we stated:

" 'It is an old and familiar rule that "where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment." ' " (Citations omitted).

*Id.; see also Gould,* 273 Md. at 495, 331 A.2d at 61 (quoting *Henry,* 273 Md. at 133 n. 1, 328 A.2d at 295 n. 1 (in turn quoting *Maguire* )).

When we construed the two statutes in context this Court reached a different conclusion than the trial court had. Article 56 provided, in 23 separate sections, the licensing requirements for 23 businesses. *Maguire,* 192 Md. at 624, 65 A.2d at 303. The titles of the 23 sections gave no indication that some

businesses would be covered by more than one section, and, in fact, plumbers and gas fitters were the only businesses to be covered by more than one section. *Id.* This Court had not been presented with, and could not discern, any reason as to why plumbers and gas fitters should be the only businesses affected in this way. *Maguire,* 192 Md. at 625, 65 A.2d at 303. Finally, this Court noted that the definition of "construction" in § 291 could be given effect without including plumbers or gas fitters within its scope. *Maguire,* 192 Md. at 624–25, 65 A.2d at 303. We concluded that § 291 was properly construed to exclude plumbers and gas fitters. *Maguire,* 192 Md. at 625, 65 A.2d at 303.

■ In the present case, we consider the plain language of § 9–305 in context, and we hold that the General Assembly did not intend that relatives be prosecuted under both statutes, making those relatives eligible for double sentences. A non-relative who abducts a child may be prosecuted only under § 2 and is eligible to receive a maximum penalty of twenty years imprisonment. Were we to accept the State's theory, a non-custodial parent who abducts his or her child from the child's lawful custodian would be eligible to receive twenty years imprisonment under § 2 and one year imprisonment under § 9–305. Leaving aside any potential constitutional infirmities of such a scenario, we think that if the General Assembly had intended to punish a non-custodial parent who abducts his or her own child more harshly than a stranger who abducts the same child, it would have stated that intention very clearly.

Rather, the legislature intended non-custodial parents to be prosecuted for the abduction of their own children exclusively under § 9–305. Section 2, a general child abduction statute applicable to "any person . . . without color of right" had been in force for over one hundred years when the General Assembly enacted a more specific statute on the same subject and provided less severe sanctions for persons convicted under it. Under this Court's decisions in *Farmers & Merchants Bank,* 306 Md. at 63, 507 A.2d at 180, and *Maguire,* 192 Md. at 623, 65 A.2d at 302, § 9–305, a child abduction statute pertaining

specifically to relatives, must be read as an exception to § 2, the general child abduction statute. The later enacted, specific child abduction statute, furthermore, was originally codified as § 2A, providing a further indication that it was meant to be read in conjunction with § 2 and that each was meant to apply in a different situation. Finally, § 2 can be given effect without including "relatives" in its scope.

Thus, although this Court generally disfavors repeal by implication, we hold in this case that the General Assembly clearly intended § 9–305 to effect a limited repeal of § 2. Accordingly, § 2 applies to "any person . . . without color of right" except for "relatives," as that term is defined in § 9–305.

### III.

We affirm the holding of the Court of Special Appeals that Respondent's convictions under § 2 are improper and must be vacated. We base our holding on the intent of the General Assembly that a non-custodial parent who abducts his or her own child from the child's custodial parent be prosecuted exclusively under § 9–305. Our holding makes it unnecessary to reach the two issues presented in Respondent's cross-petition for a writ of certiorari. Respondent's convictions under § 9–305 are proper and are affirmed.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY CARROLL COUNTY.*